FILED
2023 Apr-25 PM 01:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **VALOR DISTRIBUTION, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2022-CV-_______** |
| | ) | |
| **SKIPPACK MEDICAL LAB, LLC, and UNIVERSAL MEDITECH, INC., and NORTH AMERICAN DIAGNOSTICS, LLC, and ASWINDER P. SURI aka PAUL SINGH, and DR. GULAMNABI VAHORA, MD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## COMPLAINT

---

COMES NOW the Plaintiff, VALOR DISTRIBUTION, LLC, and files this Complaint against Defendants, SKIPPACK MEDICAL LAB, LLC; UNIVERSAL MEDITECH, INC.; NORTH AMERICAN DIAGNOSTICS, LLC; ASWINDER P. SURI aka PAUL SINGH; and DR. GULAMNABI VAHORA, MD, asserting the following allegations and claims against said named Defendants.

## PARTIES

1. Plaintiff, VALOR DISTRIBUTION, LLC ("Plaintiff," or "Valor"), is

and was at all times relevant and material to this Complaint a limited liability company formed under the laws of the State of Alabama. Valor's sole member, Gregory L. Lawrence ("Mr. Lawrence"), is an adult resident citizen of the State of Alabama.

2. Defendant, SKIPPACK MEDICAL LAB, LLC ("Skippack"), is and was at all times relevant and material to this Complaint a limited liability company formed under the laws of the State of Pennsylvania. No member of Defendant Skippack is a resident citizen of the State of Alabama and, at all times relevant and material to this Complaint, Defendant Skippack's address and principal place of business was 200 Rittenhouse Circle, East Building, Suite 9, Bristol, Pennsylvania 19007-1619. At all times relevant and material to this Complaint, Defendant Skippack owned, managed, operated, and was responsible for a business operation that provided laboratory services, including, but not limited to, COVID-19 testing, and was involved in the manufacturing and distribution of COVID-19 test kits.

3. Defendant, UNIVERSAL MEDITECH, INC. ("UMI"), is and was at all times relevant and material to this Complaint a corporation formed under the laws of the State of California, the address and principal place of business of which is 1320 E. Fortune Avenue, Suite 102, Fresno, California 93725. At all times relevant and material to this Complaint, Defendant UMI owned, managed, operated, and was responsible for a business operation that developed, manufactured and marketed

medical devices, including, but not limited to, COVID-19 test kits.

4. Defendant, NORTH AMERICAN DIAGNOSTICS, LLC ("NAD"), is and was at all times relevant and material to this Complaint a corporation formed under the laws of the State of Florida. No member of Defendant NAD is a resident citizen of the State of Alabama and, at all times relevant and material to this Complaint, Defendant NAD's address and principal place of business was 618 Ridgewood Avenue, Holly Hill, Florida 32117. At all times relevant and material to this Complaint, Defendant NAD owned, managed, operated, and was responsible for a business operation that developed, manufactured, and marketed medical devices, including, but not limited to, COVID-19 test kits.

5. Defendant, Aswinder P. Suri aka Paul Singh ("Mr. Singh"), is and was at all times relevant and material to this Complaint an adult resident citizen of the State of Florida. Defendant Singh was at all times relevant and material to this Complaint an agent of Defendant NAD.

6. Defendant, Dr. Gulamnabi Vahora, MD ("Dr. Vahora"), is and was at all times relevant and material to this Complaint an adult resident citizen of the State of Pennsylvania. Dr. Vahora was at all times relevant to this Complaint an agent of Defendant Skippack and a member of SML Distribution, LLC ("SML"), a third-party limited liability company formed under the laws of the State of Pennsylvania.

## VENUE AND JURISDICTION

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and/or omissions giving rise to the claims asserted in this Complaint occurred in Jefferson County, Alabama.

8. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between the Plaintiff (an Alabama limited liability company, whose sole member is a resident citizen of Alabama), the individual Defendants (who are adult legal residents of Pennsylvania and Florida), and the corporate Defendants (a California corporation and Florida and Pennsylvania limited liability companies, neither of which have any members that are resident citizens of Alabama) and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

9. This Court may exercise specific personal jurisdiction over the Defendants by virtue of the fact that (a) Plaintiff's claims arise out of the Defendants' purposeful contacts with the State of Alabama, by and through Plaintiff's status as an Alabama limited liability company, Plaintiff's physical domicile in the State of Alabama, and Plaintiff's sole member's residence citizenship in the State of Alabama; (b) the Defendants purposefully availed themselves of the privilege of conducting business activities within the State of Alabama by purposefully engaging in and directing business in Alabama with Plaintiff and, as set forth herein, by knowingly and purposefully exchanging and engaging in communications with the

Plaintiff, an Alabama-based limited liability company, by and through its sole member, an Alabama resident citizen, including telephone, email and text message communications with Plaintiff and its sole member in connection with the business dealings between Plaintiff and Defendants; and (c) this Court's assertion of specific personal jurisdiction over the Defendants would not offend traditional notions of fair play and substantial justice.

10. In the lead up to the consummation of the business dealings between Plaintiff and Defendant, Plaintiff's Chief Executive Officer, President and sole member, Mr. Lawrence, exchanged numerous emails with Defendant, Dr. Vahora.

11. Specifically, between March 2021 and January 2022, Dr. Vahora substantively participated in numerous email exchanges in which Mr. Lawrence was either sender or recipient. In each of these email exchanges, Dr. Vahora communicated information and made representations of material fact to Mr. Lawrence regarding various aspects of the business dealings described in this Complaint.

12. The signature block for the email address utilized by Mr. Lawrence to participate in the above-referenced email communications with Dr. Vahora, which said signature block is reproduced below, clearly identifies that Plaintiff is, and was, based in Hoover, Alabama:

**Greg Lawrence**
CEO/President
Phone: (205) 733-7119
Fax: (205) 878-9818
CAGE: 9A0M8
DUNS: 118584103
1 Chase Corporate Drive, Suite 400
Hoover, AL 35226
****Currently in the process of getting SDVOSB Certification****
To book an appointment with me please visit: https://calendly.com/valorcompanies

VALOR DISTRIBUTION

VOSB

13. In addition to their email communications, Dr. Vahora and Mr. Lawrence also engaged in numerous telephone conversations during 2021 and 2022 regarding various aspects of the business dealings made the basis of this Complaint.

14. All of the telephone calls between Dr. Vahora and Mr. Lawrence were made to Mr. Lawrence's mobile phone number, which begins with a 205 area code, an area code covering central and northwest Alabama.

15. Similarly, Dr. Vahora and Mr. Lawrence also exchanged a number of text messages regarding various aspects of the business dealings made the basis of this Complaint. In particular, in response to questions posed by Mr. Lawrence, Dr. Vahora sent text messages to Mr. Lawrence in February 2021, October 2021 and November 2021.

16. Defendant Skippack also engaged in email communications with Plaintiff via Mr. Lawrence. Specifically, on numerous occasions between October and December 2021, Defendant Skippack, by and through its representative, Shaista

Miam, substantively communicated information to Mr. Lawrence regarding various aspects of the business dealings described in this Complaint.

17. Defendant Skippack's email communications with Mr. Lawrence were sent to and received from the above-referenced email address, which contained Mr. Lawrence's email signature clearly identifying that Plaintiff was based in and conducting business as Valor's member and representative in the State of Alabama.

18. Likewise, Defendant UMI engaged in numerous telephone conversations with Mr. Lawrence regarding various aspects of the business dealings made the basis of this Complaint. Specifically, during the fourth quarter of 2021 and the 1st quarter of 2022, Defendant UMI, by and through its representative, Karekin Khatchadoorian, participated in at least three (3) telephone calls with Mr. Lawrence regarding the supply of COVID-19 test kits that were to be sold pursuant to and in accord with the business model described in this Complaint.

19. All of the telephone calls between Mr. Khatchadoorian and Mr. Lawrence were made using Mr. Lawrence's mobile phone number, which begins with a 205 area code, an area code covering central and northwest Alabama.

20. Finally, Defendants NAD and Mr. Singh, at all times relevant to the allegations and claims asserted in this Complaint, knew that Plaintiff was an exclusive distributor of non-party SML; knew that in its capacity as an exclusive distributor of SML, Plaintiff would be brokering sales of COVID-19 test kits that

were licensed, manufactured, distributed and sold as described in this Complaint; and knew that Plaintiff was a limited liability company formed under the laws of and based in the State of Alabama.

21. Having the knowledge set forth in the preceding paragraph, including the knowledge of Plaintiff's ties to the State of Alabama, Defendants NAD and Mr. Singh nonetheless entered into contracts with SML, which said contracts contemplated the licensing, manufacturing, distribution and nationwide sale of COVID-19 test kits, including the contemplated sale of COVID-19 test kits to individuals and entities based in and/or doing business in the State of Alabama.

## FACTUAL BACKGROUND

**Introduction.**

22. Valor is and was at all times relevant and material to the facts and allegations asserted in this Complaint a limited liability company specializing in the distribution of over the counter and point-of-care COVID-19 test kits.

23. During the latter part of 2021, and the initial part of 2022, Valor, in its capacity as an exclusive distributor for SML, contracted for and sold various types of COVID-19 test kits.[1]

24. SML is a Pennsylvania limited liability company which, at the time of

[1] Valor was formed on January 28, 2022. Prior to Valor's formation, its sole member, Gregory L. Lawrence, acting in his individual capacity as a sole proprietorship, was contracting for and selling COVID-19 test kits through the manufacturing and distribution chain described in this Complaint.

its formation, had three (3) members: Dr. Vahora; Woodside Acquisitions, Inc. ("Woodside"); and Pelican Medical Distributors, LLC.

25. Valor's sale of COVID-19 test kits was done consistent with a business model in which Skippack, in conjunction with UMI and NAD, was responsible for licensing, manufacturing and obtaining, at wholesale, COVID-19 test kits, which such test kits then entered into a distribution chain in which SML was master distributor and Valor was one of a select number of exclusive distributors.

26. In its capacity as an exclusive distributor, Valor would sell the test kits to sub-distributors and/or end users and, in connection therewith, assumed responsibility for buyer relations, marketing and customer service, while SML, in its capacity as master distributor, was responsible for shipping and logistics associated with delivering the test kits to sub-distributors and/or end users.

27. From the middle part of 2021 through February, 2022, consistent with its role as an exclusive distributor of SML consistent with the business model described above, Valor distributed three (3) different types of COVID-19 test kits: (a) the Oral Rapid SARS-CoV-2-Antigen Rapid Test Kit (the "ORS test kit"); (b) the Joysbio SARS-CoV-2 Antigen Rapid Test Kit (Colloidal Gold) (the "Joysbio test kit"); and (c) the Skippack Medical Lab SARS-CoV-2 Antigen Rapid Test Kit (Colloidal Gold) (the "Skippack test kit") (the ORS, Joysbio and Skippack test kits being collectively referred to herein as the "COVID-19 test kits").

**Dr. Vahora's misrepresentations regarding COVID-19 test kits.**

28. Consistent with the above-described business model, in August 2021, SML entered into an exclusive Manufacturing Supply Agreement ("MSA") with Defendant UMI pursuant to which UMI agreed to manufacture COVID-19 nasal pharyngeal antigen test kits which, once manufactured, became the Skippack test kits.

29. SML's decision to enter into the MSA with UMI was based on Dr. Vahora's representations that the Skippack test kits, which were to be manufactured by UMI consistent with the MSA, could be sold to end users under and consistent with CLIA rules and guidelines, and that certification of the Skippack test kits by the United States Food and Drug Administration ("FDA") was not required.

30. The Clinical Laboratory Improvement Amendments ("CLIA") is a federal program created by Congress and administered by the Centers for Medicare & Medicaid Services ("CMS"). While the explicit purpose of CLIA is to ensure quality laboratory testing, the practical impact of CLIA allows for deployment of non-invasive clinical laboratory tests through CLIA-certified laboratories without such deployment being delayed by the process associated with obtaining FDA certification of such laboratory tests.

31. The interaction and relationship between CLIA and FDA regulations and administrative guidance, as related to COVID-19 testing, has changed on a

number of occasions since the beginning of the global COVID-19 pandemic in early 2020.

32. Specifically, in February 2020, in its Policy for COVID-19 Tests During the Public Health Emergency, the FDA stated that it would not object to a CLIA-certified high-complexity laboratory offering a COVID-19 Laboratory Developed Test ("LDT") after successfully validating its test and notifying FDA, but only if the laboratory submitted an Emergency Use Authorization ("EUA") request to FDA within 15 days of such notification.

33. During the summer of 2020, the United States Department of Health and Human Services ("HHS") reversed this position. Specifically, in a June 22, 2020 legal memorandum, the HHS Office of General Counsel opined, in relevant part, that (1) LDTs were not subject to premarket review provisions in the Food, Drug, and Cosmetic Act; and (2) that the FDA's characterization of LDTs as regulated medical devices constituted legislative rules without notice-and-comment rulemaking and, thus, were inconsistent with the Administrative Procedure Act.

34. Importantly, Dr. Vahora was the individual to whom Woodside and Valor looked for guidance on whether the COVID-19 test kits could be sold by, through and in accord with Skippack's CLIA certification, consistent with CLIA rules and guidelines, and that FDA certification of the COVID-19 test kits was not required. At all times relevant and material to this Complaint, Woodside and Valor

relied exclusively on Dr. Vahora's advice and counsel relating to whether the licensing, manufacturing, distribution and sale of the COVID-19 test kits was being done consistent with CLIA and/or FDA regulations.

35. Prior to November 2021, Dr. Vahora repeatedly made affirmative representations to Woodside and Valor that the COVID-19 test kits could, in fact, be licensed, manufactured, distributed and sold by, through and in accord with Skippack's CLIA certification consistent with CLIA rules and guidelines, and that FDA certification of the COVID-19 test kits was not required.

36. However, on November 15, 2021, HHS issued a statement withdrawing its reliance on the aforementioned memorandum of June 2020 and stating that "HHS no longer has a policy on LDTs that is separate from FDA's longstanding approach in this area."

37. Dr. Vahora knew, or should have known, that the November 15, 2021 statement by HHS was going to have a potentially detrimental impact on the licensing, manufacturing, distribution and sale of the COVID-19 test kits.

38. Yet, when Woodside and Valor sought express confirmation from Dr. Vahora that HHS's November 15, 2021 statement did not make illegal, invalidate, or otherwise affect the licensing, manufacturing, distribution and sale of the COVID-19 test kits consistent with the business model described in this Complaint, Dr. Vahora specifically and expressly represented to Woodside and Valor that the

licensing, manufacturing, distribution and sale of the COVID-19 test kits was and remained authorized by, through, and consistent with CLIA rules and guidelines and, thus, that the HHS's statement of November 15, 2021 was of no consequence to their business operations and dealings.

39. Indeed, Dr. Vahora repeatedly and expressly represented to Woodside and Valor that he possessed the "oldest" CLIA certification in the country and that he would never take any action to jeopardize that certification via the distribution of tests that were not appropriately certified by for use by end users.

40. Woodside and Valor relied to their detriment on the false misrepresentations of Dr. Vahora in the wake of the November 2021 statement by HHS. Specifically, on November 15 2021, the very day HHS issued the statement outlined above, Defendant Skippack, as licensor, and SML and Defendant UMI, as licensees, entered into an IP Licensing Agreement pursuant to which Skippack provided SML and Defendant UMI with an exclusive license to use certain intellectual property that would be incorporated into the Skippack test kits.

41. Prior to the commencement of the discussions and negotiations that led to the formulation of the business model described in this Complaint, UMI had manufactured and sold COVID-19 test kits incorporating intellectual property proprietary to UMI. However, UMI was informed by the FDA that it was not authorized to manufacture and sell COVID-19 test kits incorporating its intellectual

property.

42. Thereafter, Dr. Vahora represented to UMI that COVID-19 test kits could, in fact, be manufactured, distributed and sold by him, through Skippack, in accord with CLIA rules and guidelines (without FDA certification), so long as the intellectual property incorporated into such test kits was in Dr. Vahora and/or Skippack's name.

43. Consistent with Dr. Vahora's express and specific representations, and notwithstanding the fact that the intellectual property relating to such test kits was owned by and proprietary to UMI, Dr. Vahora and Skippack licensed such intellectual property to UMI and SML so that the test kits could be manufactured and sold/distributed under Skippack's CLIA certification.

44. At all times relevant and material to this Complaint, Valor, via both its contractual relationship with SML and based on direct communications with the various named Defendants, reasonably relied upon the Defendants' representations of material fact and, in specific reliance thereon, operated under the understanding and belief that the COVID-19 test kits it sold pursuant to its relationship with SML were approved for use in the United States as an LDT by, through, and in accord with Skippack's CLIA certification.

**The contractual relationship between SML and NAD.**

45. In early 2022, SML also entered into a separate contractual agreement

with Defendant NAD to license, obtain at wholesale and/or manufacture and distribute COVID-19 test kits throughout the United States, including Alabama.

46. Once manufactured, these test kits were to be the ORS test kits.

47. The negotiations that ultimately led to the consummation of this contractual relationship, which such negotiations were commenced at the insistence of Dr. Vahora, who represented to Woodside and Valor that he had a preexisting relationship with Mr. Singh, occurred after the HHS statement of November 15, 2021.

48. Yet, notwithstanding the fact that Defendants NAD and Mr. Singh knew or should have known of the potential detrimental impact of the HHS statement of November 15, 2021 on the business model contemplated in their negotiations, Defendants NAD and Mr. Singh nonetheless affirmatively represented to Valor and Woodside that FDA approval of COVID-19 test kits was not required and that ORS test kits could be manufactured, distributed and sold as LDTs.

49. This was not the only affirmative misrepresentation of material fact that Mr. Singh made to Woodside. To the contrary, during the aforementioned negotiations, and afterwards, Mr. Singh made numerous representations of material fact to Woodside, which Mr. Singh knew or should have known would be communicated to Valor, which said representations were designed and intended to induce Woodside and Valor to enter into a contractual relationship with NAD.

50. For example, Mr. Singh represented to Woodside that he was a medical doctor. This was false. Mr. Singh also represented to Woodside that he was the owner of NAD, though he was not, and he pledged NAD stock to various entities involved in the commercial relationship between SML and NAD, which such stock he did not own and which such stock he was not otherwise authorized to pledge.

51. At all times relevant and material to this Complaint, NAD knew, or should have known, that Mr. Singh was representing himself as an agent of NAD and was acting on NAD's behalf in entering into a contractual relationship with SML for the manufacture, distribution and sale of COVID-19 test kits.

**Dr. Vahora's control over the manufacturing, distribution and sale of the Skippack test kits.**

52. Dr. Vahora was directly involved in and exercised a significant degree of control over the process of manufacturing and packaging the Skippack test kits. Specifically,

a. Dr. Vahora provided $75,000 in seed money to begin production of the Skippack test kits by UMI.

b. Dr. Vahora offered extensive input on the packaging of the Skippack test kits and oversaw and offered extensive substantive commentary on the instructions that were included as part of the packaging of the Skippack test kits.

c. Dr. Vahora validated test results in order to demonstrate that selling the Skippack tests through his CLIA license was legal.

**Valor becomes aware of issues regarding certification of the COVID-19 test kits.**

53. In the latter part of January 2022, UMI informed Dr. Vahora and Woodside that it was taking the position that LDTs could not be sold outside of the laboratory in which they were developed and recommended that SML begin application for an EUA.

54. Specifically, in a January 29, 2022 email to Dr. Vahora and to Chris Nagle, a member of Woodside, Karekin Khatchadoorian, stated "[i]t came to UMI's attention that LDTs, by definition, cannot be sold outside of the laboratory in which they were developed." Mr. Khatchadoorian continued "[a]ccording to the announcement FDA made on November 15, 2021…FDA now generally expects newly offered COVID-19 tests, including LDTs, to have an EUA."

55. Paraphrased, UMI, via Mr. Khatchadoorian's email, was stating that the manufacturing, distribution, and sale of the Skippack and ORS test kits, as contemplated via the business model described in this Complaint, was in violation of applicable rules and regulations promulgated by the FDA.

56. Yet, Dr. Vahora, in discussing this email with Mr. Nagle, dismissed Mr. Khatchadoorian's concerns, stating "[h]e is getting now new accounts, he want to make profit for him self only."

57. This was not the only time that Woodside expressed concerns to Dr. Vahora and Mr. Singh regarding the UMI email. Yet, in response to such concerns,

both Dr. Vahora and Mr. Singh specifically and expressly represented to Woodside, knowing their representations would be communicated to Valor, that UMI's position was false and/or erroneous, and that CLIA certification, without more, was sufficient to manufacture, distribute and sell the Skippack and ORS test kits.

58. In early March 2022, the FDA informed Skippack and Dr. Vahora that Skippack could no longer sell the Skippack test kits as an LDT under its CLIA certification.

59. Skippack and Dr. Vahora not only ignored the FDA's directive, but also affirmatively suppressed the FDA directive from SML and Valor.

60. Valor first became aware of issues associated with the marketability, reliability, and/or certification of the COVID-19 test kits in March 2022, when SML was informed by the FDA that it would need to issue a Medical Device Recall because the COVID-19 test kits were "not authorized, cleared or approved by the FDA for marketing and distribution in the US."

61. The FDA's March 2022 Medical Device Recall letter preceded a series of recalls:

d. In May 2022, the FDA mandated the recall of COVID-19 test kits produced and manufactured by Defendant Skippack.

e. In June 2022, the FDA mandated the recall of COVID-19 test kits produced and manufactured by Defendant NAD.

f. In December 2022, the FDA mandated the recall of COVID-19 test kits produced and manufactured by Defendant UMI.

62. As a result of the above-referenced recalls, Valor was left unable to fulfill its obligations under various contracts for the sale of the COVID-19 test kits.

63. As a result of Defendants' conduct, as outlined above, Valor has sustained damages far exceeding $75,000.00, the amount in controversy required to trigger this Court's diversity-based jurisdiction over the claims asserted by Valor, as set forth below.

## CAUSES OF ACTION

## COUNT ONE

## BREACH OF CONTRACT

**(Against Defendants Universal Meditech, Inc. and North American Diagnostics, LLC)**

64. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

65. Valor, through its contractual relationship with SML, was an agent of SML and, thus, a direct, intended beneficiary of the MSA between SML and Defendant UMI.

66. Valor, through its contractual relationship with SML, was an agent of SML and, thus, a direct intended beneficiary of the contractual agreement between SML and Defendant NAD.

67. Valor has performed consistent with its contractual obligations by undertaking to sell and distribute COVID-19 test kits manufactured by Defendant UMI and Defendant NAD.

68. As described and detailed herein, Defendants UMI and NAD have violated and thus breached their contractual agreements with SML, of which agreements Valor was at all times relevant and material a direct, intended third party beneficiary.

69. Valor has been damaged, and will continue to suffer damage, as a result of Defendants UMI and NAD's breach of their contractual agreements with SML.

WHEREFORE, Valor demands judgment against Defendants UMI and NAD, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

## COUNT TWO

## BREACH OF WARRANTY

## (Against Defendants Universal Meditech, Inc. and North American Diagnostics, LLC)

70. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

71. Through the MSA, Defendant UMI expressly and impliedly warranted that the COVID-19 test kits were compliant with all applicable regulatory requirements and thus were of a merchantable quality.

72. Defendant UMI breached this warranty by failing to ensure the COVID-19 test kits complied with all relevant regulatory requirements.

73. Through its agreement with SML, as described herein, Defendant NAD warranted that the COVID-19 test kits it manufactured and sold would be merchantable and compliant with all applicable regulatory requirements.

74. Defendant NAD breached this warranty by failing to ensure that the COVID-19 test kits complied with all applicable regulatory requirements.

75. Valor, through its contractual relationship with SML, was an agent of SML and, thus, a direct, intended beneficiary of warranties issued by UMI in the MSA and the warranties issued by NAD.

76. As a result of Defendant UMI and NAD's breach of their warranties, Valor has been damaged, and will continue to suffer damage.

WHEREFORE, Valor demands judgment against Defendants UMI and NAD, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

## COUNT THREE

## FRAUD/DECEIT/SUPPRESSION

**(Against Defendants Skippack, Dr. Vahora, NAD and Mr. Singh)**

77. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

78. Defendants Skippack, Dr. Vahora, NAD and Mr. Singh made at least the following misrepresentations to and/or suppressed the following information from Valor:

a. That the COVID-19 test kits Valor would be selling as part of the business model described herein would be compliant with all applicable regulatory requirements.

b. That the COVID-19 test kits Valor would be selling as part of the business model described herein were approved for sale and distribution in the United States.

c. That the COVID-19 test kits Valor would be selling as part of the business model described herein could be sold as LDTs and did not require further regulatory approval or certification, including by the FDA.

79. At all times relevant and material to this Complaint, Defendants Skippack, Dr. Vahora, NAD and Mr. Singh knew, or should have known, that the above-stated representations were false and/or materially misleading.

80. At all times relevant and material to this Complaint, Defendants Skippack, Dr. Vahora, NAD, and Mr. Singh negligently, recklessly, and/or intentionally suppressed, omitted, and/or failed to disclose material information to Valor.

81. At all times relevant and material to this Complaint, Defendants

Skippack, Dr. Vahora, NAD, and Mr. Singh knew that Valor would rely upon its representations and suppression, known by them to be false, inaccurate, misleading, and/or reckless, and Valor indeed justifiably relied upon their representations.

82. As a result of Defendants Skippack, Dr. Vahora, NAD, and Mr. Singh's misrepresentations and suppression of material information pertaining to the above-described topics, Valor has been damaged, and will continue to suffer damages.

WHEREFORE, Valor demands judgment against Defendants Skippack, Dr. Vahora, NAD and Mr. Singh, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

## COUNT FOUR

## NEGLIGENCE/WANTONNESS (Skippack, Dr. Vahora, NAD, Mr. Singh)

83. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

84. At all times relevant and material to the allegations and claims asserted in this Complaint, Defendants Skippack, Dr. Vahora, NAD and Mr. Singh owed a duty of reasonable care to Valor with respect to whether the COVID-19 test kits were legally marketable, through and in accord with Skippack's CLIA certification, or whether such test kits required FDA certification and/or licensure, either through an EUA or otherwise.

85. Defendants Skippack, Dr. Vahora, NAD, and Mr. Singh negligently

and/or wantonly and/or recklessly advised Valor that FDA certification and/or licensure of the COVID-19 test kits was unnecessary, and that such test kits could be sold to end users by, through and in accord with Skippack's CLIA certification.

86. Defendants Skippack, Dr. Vahora, NAD and Mr. Singh provided such advice to Valor with actual and/or constructive knowledge that either FDA certification and/or licensure of the COVID-19 test kits was required and/or that there were regulatory ambiguities regarding the sale of the test kits by, through and in accord with Skippack's CLIA certification that jeopardized the sale of the COVID-19 test kits consistent with the business model described herein.

87. This conduct on the part of Defendants Skippack, Dr. Vahora, NAD and/or Mr. Singh constituted a breach of duties that these defendants owed to Valor.

88. As a result of the breach of the duties owed by Defendants Skippack, Dr. Vahora, NAD and Mr. Singh to Valor, Valor has been caused to suffer damages.

WHEREFORE, Valor demands judgment against Defendants Skippack, Dr. Vahora, NAD and Mr. Singh, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

## COUNT FIVE

## TORTIOUS INTERFERENCE

## (Against Defendant Dr. Vahora)

89. Valor adopts and re-alleges the factual allegations stated in Paragraphs

1- 63 of this Complaint as if set out here in full.

90. Valor, via its contract with SML, was a beneficiary of SML's exclusive contract with Defendant UMI.

91. The MSA between Defendant UMI and SML dictated that SML purchase COVID-19 test kits exclusively from Defendant UMI and that Defendant UMI would in turn manufacture and sell to SML all of the COVID-19 test kits manufactured by UMI.

92. At all times relevant and material to this Complaint, Dr. Vahora had full knowledge of the MSA, Valor's interest as an agent of SML under the MSA, Valor's interests as a third party beneficiary, and the warranties issued by UMI under the MSA pertaining to the regulatory compliance of COVID-19 test kits manufactured by UMI under the MSA.

93. Notwithstanding this knowledge, Dr. Vahora, acting individually, and not in his capacity as a member of SML, actively induced Valor to purchase and distribute COVID-19 test kits manufactured by Defendant UMI despite the fact that Dr. Vahora knew or should have known that these test kits required FDA authorization to be marketed, sold, and distributed.

94. Valor has suffered damages and will continue to suffer damages due to Defendant Vahora's tortious interference with Valor's contracts and/or prospective economic benefits.

WHEREFORE, Valor demands judgment against Defendant Vahora, including compensatory and punitive damages, and all other relief available to Valor under appliable law.

## RICO CLAIMS

## (Against All Named Defendants)

95. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

96. Valor alleges that each of the Defendants' conduct, as described herein, constitutes "racketeering," as defined in 18 U.S.C. § 1964(c), as such conduct constituted and/or was facilitated and advanced via wire fraud, or committing fraud by means of electronic transmissions over wire.

97. Defendants engaged in multiple instances of wire fraud, including numerous instances of affirmatively representing to SML and Valor that the COVID-19 test kits were approved for sale and distribution in the United States as Laboratory Developed Tests, despite knowledge this information was false.

98. 18 U.S.C. § 1962(c) provides for relief from parties who engage in a pattern of racketeering activity, while Section 1962(a) provides for relief from parties who use income generated through a pattern of racketeering activity, and Section 1962(d) provides for relief from parties who conspire to violate applicable racketeering laws. As set forth below, Defendants are liable under each of these

three (3) sections of the Federal RICO statute.

99. 18 U.S.C. § 1964(c) allows "any person injured in his business or property by reason of a violation of section 1962 of this chapter" to "sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee …."

## COUNT SIX

## RICO – VIOLATION OF 18 U.S.C. § 1962(c)

100. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

101. 18 U.S.C. § 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . "

102. Each Defendant, at all times relevant and material to this Complaint, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3) because each Defendant is capable of holding, and does hold, "a legal or beneficial interest in property."

103. Defendants' activities, as described herein, include at least two (2) acts of racketeering activity in 2021 and 2022. Accordingly, Defendants' conduct

constitutes a "pattern" of racketeering activity.

104. Multiple such acts occurred over the course 2021 and 2022 when Defendants fraudulently communicated that the COVID-19 test kits manufactured and/or distributed by Defendants were capable of being sold and distributed in the United States without FDA approval.

105. Beginning in early 2021 and continuing through the initiation of the FDA Medical Device recalls, each Defendant conducted and participated in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

106. Throughout 2021 and 2022, Defendants formed an association-in-fact Enterprise within the meaning of 18 U.S.C. § 1961(4).

107. This Enterprise consisted of a group of "persons" associated together for the common purpose of intentionally and willfully deceiving and defrauding Valor by creating and conducting a scheme to distribute and sell unapproved, unauthorized and uncertified COVID-19 test kits.

108. All Defendants participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity, including commission of wire fraud as defined by 18 U.S.C. § 1343, for the unlawful purpose of intentionally defrauding Plaintiff.

109. Plaintiff was deceived by continuing and repeated statements by

Defendants that the COVID-19 test kits manufactured and distributed by Defendants were capable of being sold or distributed in the United States without FDA approval or authorization.

110. Defendants had a duty to disclose to Plaintiff that the COVID-19 test kits were not authorized or approved for sale or distribution in the United States.

111. Defendants' failure to disclose that the COVID-19 test kits were not authorized or approved for sale or distribution in the United States was fraudulent.

112. Defendants used wires for transmission, delivery, and shipment of the following by Defendants or third parties, all of which were related to the distribution and sale of the COVID-19 test kits, and they were foreseeably caused to be sent as a result of and in connection with Defendants' fraudulent scheme:

a. Wires between defendants;

b. Email and telephone communication between Defendants; and

c. Payments made by Plaintiff to Defendants in 2021 and 2022.

113. At all times relevant and material to this Complaint, Defendants have been involved in and perpetuated a plan to scheme or defraud; have had the intent to defraud and have willfully participated in the scheme to defraud with actual knowledge of its fraudulent nature and with specific intent to defraud; could have reasonably foreseen that interstate wires would be used; and actually used interstate wires to further Defendants' scheme.

114. The Enterprise engaged in and affected interstate commerce by way of said wire fraud.

115. The wire transmissions described herein were made in furtherance of Defendants' scheme and common course of conduct.

116. To achieve the common goals of their Enterprise and scheme, Defendants knowingly and willfully concealed from Plaintiff the unlawfulness of their conduct, which was committed with the knowledge and at the instruction of all Defendants.

117. As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, Plaintiff has been injured in its business and property, causing Plaintiff to suffer monetary damages in an amount to be proven at the time of trial.

118. Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three (3) times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

WHEREFORE, Valor demands judgment against Defendants, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

**COUNT SEVEN**

**RICO – VIOLATION OF 18 U.S.C. § 1962(a)**

119. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

120. 18 U.S.C. § 1962(a) makes it "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a).

121. At all times relevant and material to this Complaint, beginning in early 2021 and continuing through the aforementioned medical device recalls, Defendants received income derived from a pattern of racketeering activity to use or invest a part of such income or the proceeds of such income in the establishment and operation of an enterprise that is engaged in, or the activities of which affect, interstate or foreign commerce, in violation of 18 U.S.C. § 1962(a).

122. All Defendants agreed to and did use income received directly from a pattern of racketeering activity to control, establish and operate the Enterprise, which was engaged in and affected interstate commerce, including wire fraud as defined by 18 U.S.C. § 1343, and for the unlawful purpose of intentionally defrauding Plaintiff.

123. As a direct and proximate consequence of the conduct of Defendants

and each of them as alleged herein, Plaintiff has been injured in its business and property, causing Plaintiff to suffer monetary damages in an amount to be proven at the time of trial.

124. Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three (3) times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

WHEREFORE, Valor demands judgment against Defendants, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

## COUNT EIGHT

## RICO – VIOLATION OF 18 U.S.C. § 1962(d)

125. Valor adopts and re-alleges the factual allegations stated in Paragraphs 1- 63 of this Complaint as if set out here in full.

126. 18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

127. As alleged in the preceding sections, each Defendant, at all relevant times, is and has been a "person" within the meaning of 18 U.S.C. § 1961(3).

128. At all relevant times, beginning in early 2021 and continuing at least through the aforementioned medical device recalls, the Defendants and each Defendant agreed to and did conspire to violate 18 U.S.C. §§ 1962 (a) and (c), as

alleged above and incorporated herein, in violation of 18 U.S.C. § 1962(d). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described above, and to receive income derived from a pattern of racketeering activity and to use such income or the proceeds of such income in the establishment and operation of that enterprise.

129. Defendants have knowingly, willfully and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise described previously through a pattern of racketeering activity (wire fraud).

130. Defendants have knowingly, willfully, and intentionally conspired and agreed to receive income derived from a pattern of racketeering activity (wire fraud) and to use such income or the proceeds of such income in the establishment and operation of the enterprise described previously.

131. Defendants' conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(c) and (a), in violation of 18 U.S.C. § 1962(d).

132. As a direct and proximate consequence of the conduct of Defendants and each of them as alleged herein, Plaintiff has been injured in its business and property, causing Plaintiff to suffer monetary damages in an amount to be proven at the time of trial.

133. Because of Defendants' violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiff for three (3) times the damages Plaintiff has sustained, plus the

cost of this suit, including reasonable attorneys' fees.

WHEREFORE, Valor demands judgment against Defendants, including compensatory and punitive damages, and all other relief available to Valor under applicable law.

## PRAYER FOR RELIEF

WHEREFORE, based on the above and foregoing, Plaintiff, Valor Distribution, LLC, requests that it be awarded: (1) compensatory damages in an amount exceeding $75,000.00, which said amount will be proven at trial and determined by a struck jury; (2) punitive damages in an amount deemed reasonable by struck jury; (3) enhanced (treble) monetary damages pursuant to 18 U.S.C. § 1964(c); (4) attorneys' fees and litigation-related costs and expenses; and (5) any and all other relief deemed proper.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL ISSUES.**

Respectfully submitted,

*/s/* R. Rhett Owens
R. Rhett Owens (OWE038)
Nathan C. Vanderveer (VAN048)
Tyler J. Pritchard (PRI100)

*Attorneys for the Plaintiff*

OF COUNSEL:
BODEWELL, LLP
1286 Oak Grove Road, Suite 200
Birmingham, AL 35209
Tel.: (205) 533-7878
Fax: (205) 922-5819
Email: Rhett@bodewell-law.com
Email: Nate@bodewell-law.com
Email: Tyler@bodewell-law.com

**THE FOLLOWING DEFENDANTS ARE TO BE SERVED PROCESS BY THE CLERK IMMEDIATELY BY CERTIFIED MAIL; RETURN RECEIPT REQUESTED:**

**Skippack Medical Lab, LLC**
**c/o Registered Agent**
**200 Rittenhouse Circle**
**East, Unit 9**
**Bristol, Pennsylvania, 19007**

**Universal Meditech, Inc.**
**c/o Registered Agent Xiaoxiao Wang**
**1320 E. Fortune Avenue**
**Suite 102**
**Fresno, California 93725**

**North American Diagnostics, LLC**
**c/o Registered Agent Elizabeth A. Lashinsky**
**618 Ridgewood Avenue**
**Holly Hills, Florida 32117**

**Dr. Gulamnabi Vahora**
**820 Timber Creek Lane**
**Wayne, Pennsylvania 19087**

**Aswinder P. Suri aka Paul Singh**
**To be served upon determination of current contact information**